******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LAWRENCE M.* (SC 21032)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

### *Syllabus*

Convicted, in two cases, of two counts of sexual assault in the first degree and two counts of risk of injury to a child, the defendant appealed to this court. The charges in one case stemmed from the defendant's alleged sexual abuse of his former girlfriend's daughter, P, sometime between February, 2011, and December, 2012, and the charges in the second case stemmed from his alleged sexual abuse of his biological daughter, C, sometime between October, 2020, and June, 2021. The state filed a motion to join the two cases for a single trial, which the trial court granted on the ground that the evidence in each case would be cross admissible. During trial, the prosecutor called an expert witness, W, who testified generally regarding the typical behavioral characteristics of child sexual abuse victims and about a common pattern of behavior among their abusers known as "grooming." The prosecutor also asked W to opine as to whether certain hypothetical facts, which closely resembled the facts in the cases involving P and C, were consistent with grooming behavior. Defense counsel objected to W's testimony in response to the prosecutor's hypothetical questions on the ground that it constituted improper bolstering of the testimony of P or C, and the trial court overruled the objection. *Held*:

The defendant could not prevail on his claim that, in deciding the state's motion for joinder, the trial court applied the wrong legal standard by improperly placing the burden of proof on him to demonstrate that joinder was not appropriate rather than requiring the state to prove that joinder was permissible.

The trial court's use of the phrase "eight or so years" to describe the approximate time period between the alleged sexual abuse of P and C did not indicate that that the court had failed to view the facts in a light most favorable to the defendant when deciding the state's motion for joinder, as the time gap between the alleged assaults was between about eight and ten years, which

---

*In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024); we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

is a colloquial meaning that this court attributed to "eight or so years," and the defendant did not offer any evidence indicating that one end of the range was more likely than the other.

Moreover, the trial court's statement that the propensity evidence derived from both incidents of sexual abuse was "not more prejudicial than probative" did not indicate that the court had applied an incorrect legal standard by relieving the state of its burden of demonstrating that the probative value of that evidence outweighed its prejudicial effect, as the trial court's decision as a whole demonstrated that the court had conducted the appropriate balancing test in determining that the state had met its burden and that the defendant had not rebutted that showing.

There was no merit to the defendant's claim that the trial court had abused its discretion when it allowed W to testify in response to certain hypothetical questions posed by the prosecutor that contained facts that closely tracked the facts of the present cases on the ground that such testimony served to improperly bolster the credibility of P and C.

The prosecutor's hypothetical questions and W's answers to those questions fell within the scope of expert testimony that this court had recognized as permissible in *State* v. *Favoccia* (306 Conn. 770), as W was not asked to testify specifically about whether P or C had exhibited the behavioral characteristics of child sexual assault victims but, rather, was asked to opine only about whether the hypothetical facts were generally consistent with behavior known as grooming.

Argued January 29—officially released May 5, 2026

*Procedural History*

Substitute information, in the first case, charging the defendant with the crimes of sexual assault in the first degree and risk of injury to a child, and substitute information, in the second case, charging the defendant with the crimes of sexual assault in the first degree and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven, where the cases were joined for trial; thereafter, the cases were tried to the jury before *Prescott, J.*; verdicts and judgments of guilty, from which the defendant appealed to this court. *Affirmed.*

*John R. Weikart*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's

attorney, and *Gregory L. Borrelli*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. In these cases, the state charged the defendant, Lawrence M., with sexual assault in the first degree and risk of injury to a child in two separate informations. The charges in one information stemmed from an incident involving his biological daughter, C, and the charges in the other information stemmed from an incident involving his former girlfriend's daughter, P. The trial court granted the state's motion to join the two informations for a single trial. Following a trial, the jury found the defendant guilty of two counts of first degree sexual assault in violation of General Statutes § 53a-70 (a) (2) and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).

In this direct appeal, the defendant claims that the trial court (1) applied the wrong legal standard in deciding the state's motion for joinder, and (2) abused its discretion when it allowed the state's expert witness to testify in response to hypothetical questions that mirrored the evidence in the case, thereby improperly bolstering the credibility of the complaining witnesses, C and P (complainants). We conclude that both claims are unpersuasive and, thus, affirm the judgments of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. From October, 2020, through June, 2021, when C was approximately eight to nine years old, she would sometimes stay overnight at the home that the defendant, her biological father, shared with his girlfriend. During these visits, the defendant would enter the bathroom with C and stay there while she was taking a shower. He would remove her clothes, and, from a position outside of the shower, he would lather her body with soap. C would ask the defendant to leave the bathroom, but he would not comply. On one occasion, before C took a shower, the defendant digitally penetrated her vagina. Eventually,

C reported the defendant's actions to her mother and grandmother.

The events involving P occurred in 2011 or 2012, years before the incidents with C. When P was approximately eight years old, her mother hosted a gathering of family and friends at their home. The defendant and another man, named Pete, attended the gathering. During the course of the evening, Pete fell down the basement stairs, injuring his ankle. P's mother took Pete to the hospital to be treated, and P was left alone in the house with the defendant. P and the defendant watched television while sitting on a long, L-shaped couch. The defendant began complimenting P, telling her that she was "pretty. . . ." He then asked P to show him her vagina. After hesitating initially, P quickly pulled her leggings down and back up. The defendant said that her vagina "was the prettiest he had ever seen . . . ."

At first, P tried to stop the defendant from touching her by putting her hand on his hand, but the defendant said, "it's okay; me and your sister, [M], did this and told your mom about it later on." P then removed her hand from the defendant's hand, and the defendant digitally penetrated her vagina. In 2016, P told her mother about the defendant's behavior, after having a "breakdown" and suicidal thoughts. P later reported the incident to the police in 2021, after hearing that C had come forward with a complaint against the defendant.

The defendant was arrested and subsequently charged, in a separate information relating to each complainant, with sexual assault in the first degree and risk of injury to a child. The state moved to join the two cases, asserting that the evidence that would be presented in each case would be cross admissible and that joinder was also proper pursuant to the factors set forth in *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987). The trial court granted the state's motion for joinder upon finding that the evidence in each case would be cross admissible. After a trial, the jury found the defendant guilty on all charges. The trial court imposed a total effective sentence

of twenty years of incarceration, execution suspended after fifteen years, and fifteen years of probation. This appeal followed.

I

The defendant first claims that the trial court applied the wrong legal standard when deciding the state's motion for joinder. Specifically, the defendant asserts that the court improperly placed the burden on him to demonstrate that joinder was not appropriate, rather than requiring the state to prove that joinder was permissible. In support of his claim, the defendant asserts that the court improperly viewed the evidence in the light most favorable to the state when it referred to the time frame between the two alleged sexual assaults as "eight or so years" and that the court improperly found that "the propensity evidence . . . [was] not more prejudicial than probative." We find these arguments unpersuasive.

The following additional facts and procedural history are relevant to this claim. Prior to trial, and before the informations were joined, the defendant filed in both cases a motion to exclude evidence of an accusation made by M, who is P's half sister, that he had placed her hand on his penis when she was between the ages of seven and nine. The same day, the state filed a motion to conditionally admit uncharged misconduct evidence in the form of the defendant's statement to P regarding M and a motion to join the two informations for trial. The defense did not file an objection or response to either of the state's motions.

The trial court heard argument on the motions prior to the start of evidence. With respect to the motions in limine, the prosecutor represented that he was not going to call M as a witness, and the court ruled that evidence of the defendant's statement to P regarding M would be admitted for the limited purposes of proving the defendant's intent in making the statement and showing its effect on P. With respect to the state's motion for joinder, defense counsel stated: "Unfortunately, I really can't

come up with a cogent argument [for] why [the cases] shouldn't be joined."

The trial court then granted the state's motion for joinder, explaining: "I've reviewed the proffer as it's contained in the state's supporting papers. It seems to me that . . . the evidence in one case is . . . plainly cross admissible under *State* v. *DeJesus*, [288 Conn. 418, 953 A.2d 45 (2008)], as propensity evidence. And I've applied the factors in the relevant authority, including *State* v. *James A.*, [345 Conn. 599, 286 A.3d 855 (2022), cert. denied, U.S. , 143 S. Ct. 2473, 216 L. Ed. 2d 439 (2023)], and . . . the cases that have involved cross admissibility in sexual assault cases.

"Really . . . the only [propensity] factor that's . . . even arguable in this case is the remoteness factor. The cases do establish that a period of eight or so years is . . . not so remote to warrant a conclusion that the evidence would not be cross admissible. . . . [There are] highly pertinent similarities between the alleged abuse described by the [complainants] . . . in the manner in which the sexual assault was committed, in the age of the [complainants] at the time, and other . . . important facts surrounding the alleged conduct.

"I also conclude that . . . the propensity evidence . . . is not more prejudicial than probative. I've done that weighing, and, while, of course, any propensity evidence is going to be prejudicial to a defendant . . . really, the inquiry is: is it substantially prejudicial because it would so inflame the [jurors] that they couldn't treat the evidence fairly? And I simply do not see the facts that would weigh in . . . support of the conclusion that the jury could not follow the court's instructions and handle this evidence fairly under all of the circumstances. So, the motion for joinder is granted."

We begin with a review of the governing legal principles. "[The] General Statutes and rules of practice expressly authorize a trial court to order a defendant to be tried jointly on charges arising from separate cases.

. . . *State* v. *Rivera*, 260 Conn. 486, 490, 798 A.2d 958 (2002); see General Statutes § 54-57; Practice Book § 41-19. [I]n *State* v. *LaFleur*, 307 Conn. 115, 159, 51 A.3d 1048 (2012), and *State* v. *Payne*, 303 Conn. 538, 544–50, 34 A.3d 370 (2012) . . . we rejected the notion of a blanket presumption in favor of joinder and clarified that, when charges are brought in separate informations, and the state seeks to join those informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. . . . The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the factors set forth in *State* v. *Boscarino*, [supra, 204 Conn. 722–24] . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *James A.*, supra, 345 Conn. 614. Although, typically, an appellate court reviews a trial court's decision on joinder for a manifest abuse of discretion; see, e.g., id., 614–15; because the defendant asserts that the trial court applied the incorrect legal standard, his claim raises an issue of law over which we exercise plenary review rather than apply the deferential abuse of discretion standard. See, e.g., *State* v. *Mungroo*, 299 Conn. 667, 672–73, 11 A.3d 132 (2011).

In the present case, the trial court issued an oral decision. In its decision, the court stated that it had examined the state's proffer and that, in its proffer, the state had acknowledged that it had the burden of showing that the cases should be joined. Furthermore, the court cited to and expressly relied on *State* v. *James A.*, supra, 345 Conn. 614, and *State* v. *DeJesus*, supra, 288 Conn. 473, to determine that "the evidence in one case is . . . plainly cross admissible . . . ." Taken together, these decisions lay out the proper legal standard and clearly place the burden on the state to establish that joinder is proper. See *State* v. *James A.*, supra, 614 ("when charges are brought in separate informations, and the state seeks to join those informations for trial, the state bears the

burden of proving that the defendant will not be substantially prejudiced by joinder" (internal quotation marks omitted)); *State* v. *DeJesus*, supra, 473 ("evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is . . . (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed [against] persons similar to the [complaining] witness" (internal quotation marks omitted)). The trial court's reliance on the proper case law demonstrates to our satisfaction that it applied the correct law and appropriately placed the burden on the state to demonstrate that joinder was appropriate. The defendant's contentions to the contrary are unavailing.

The defendant nevertheless makes two arguments in support of his claim that the trial court applied the incorrect legal standard. First, the defendant asserts that the court did not view the evidence in the state's proffer in the light most favorable to him, as it should have done, because the court referred to the two alleged sexual assaults as having occurred within "eight or so years . . . ." The defendant contends that, if the court had employed the correct perspective, it would have measured the time between the incidents from the earliest time that the evidence would support a finding that he had assaulted P (February, 2011) to the latest date that the abuse of C could have occurred (June, 2021), a period of more than ten years. We disagree that the trial court's use of the phrase "eight or so years" indicates that it applied the incorrect legal standard.

In its proffer, the state indicated that the alleged sexual assault involving P occurred sometime between February, 2011, and December, 2012, and that the alleged assault involving C occurred sometime between October, 2020, and June, 2021. The time period between these two incidents is therefore slightly less than eight years on the shorter end, measured from December, 2012, to October, 2020, and slightly more than ten years on the longer end, measured from February, 2011, to June,

2021. In addressing the remoteness factor, the trial court explained that "a period of eight or so years is . . . not so remote to warrant a conclusion that the evidence would not be cross admissible."

We do not agree with the defendant that the trial court's use of the phrase "eight or so years" to describe the approximate time period between the two alleged assaults is any indication that the court failed to view the facts in a light most favorable to him. Presumably, the phrase the court used is inexact because the evidence concerning the timing of the alleged assaults is inexact; the time gap between the incidents was somewhere between about eight and ten years, which is a colloquial meaning we attribute to "eight or so years . . . ." The defendant did not offer any evidence indicating that one end of the range was more likely than the other. We see no reason to conclude that the use of this phrase meant that the court, despite relying on the appropriate case law, ignored the law it had just cited and applied an incorrect burden of proof. It is clear to us that there is nothing in the trial court's reference to this time frame or anything else in the record that demonstrates that the court was not applying the appropriate burden as outlined in the cases it expressly relied on to reach its conclusion.

Second, the defendant argues that the trial court's statement that "the propensity evidence . . . is not more prejudicial than probative" demonstrates that it applied the incorrect legal standard by relieving the state of its burden of showing that the probative value of that evidence outweighed its prejudicial effect. We are not persuaded.

A review of the trial court's decision as a whole demonstrates that it examined the state's proffer and determined that the propensity evidence was more probative than prejudicial. The court's comment that "the propensity evidence . . . is not more prejudicial than probative" does not indicate that the court either diminished the state's burden or placed the burden on the defendant to prove that the evidence was unduly prejudicial. Instead, it indicates that the court was conducting the appropriate

balancing test required to determine whether the state had met its burden of showing that the probative value of this evidence outweighed its prejudicial effect and that the defendant had not rebutted that showing.[1] This is demonstrated by the fact that, immediately after using this phrase, the court stated that it had "done that weighing," which refers to the weighing of the probative value against the prejudicial effect required by the very case the court relied on, *State* v. *James A.*, supra, 345 Conn. 615–16, 620. See Conn. Code Evid. § 4-5 (b); see also Conn. Code Evid. § 4-3. We have no doubt that the trial court understood and applied the correct balancing test, and our confidence in this regard is wholly unaffected by the fact that the court stated that the propensity evidence was "not more prejudicial than probative" rather than more probative than prejudicial.

On the basis of the foregoing, we conclude that the trial court applied the correct legal standard in deciding the state's motion for joinder.

II

The defendant next claims that the trial court abused its discretion by allowing the state's expert witness, Danielle Williams, to answer two hypothetical questions posed by the prosecutor. In particular, Williams was asked whether the following actions were consistent with a common behavior used by sexual abusers known as "grooming": (1) mentioning to the victim the sexual abuse of a sibling, and (2) giving gifts to the victim that the victim is allowed to use only at the abuser's home. The defendant asserts that Williams' affirmative response to the hypotheticals amounted to improper bolstering of the credibility of the complainants because the hypotheticals so closely tracked the facts of their cases.[2] We disagree.

The following additional facts and procedural history are relevant to this claim. During the state's presentation

---

[1] In fact, when asked to respond to the state's motion for joinder, defense counsel conceded that he could not "come up with a cogent argument [for] why [the cases] shouldn't be joined."

[2] As we note, defense counsel objected to this testimony on the ground that it was improper bolstering of the complainants' testimony. On

of its case, the jury heard evidence through the testimony of both C and her mother that the defendant had given C gifts when she visited him and that the gifts were not brought home and could be used only at the defendant's house. The jury also heard P testify that, when the defendant began to assault her by sticking his hands in her pants, she resisted by putting her hand on his hand, and that the defendant then said, "it's okay; me and your sister, [M], did this and told your mom about it later on."

Thereafter, the prosecutor called Williams, a clinical psychologist who has experience working with children who are the victims of sexual abuse. Williams testified regarding the behavioral characteristics of child sexual abuse victims. Specifically, she testified that these behavioral characteristics could include self-harm, such as suicide attempts, as well as anxiety, depression and post-traumatic stress disorder. Williams also testified about a common pattern of behavior among abusers, which she referred to as "grooming." She testified that grooming is a process by which abusers seek to ingratiate themselves with the family of a child victim and to "[test] the waters to kind of see what will happen with that child . . . ." Williams explained that, as part of the grooming process, abusers may make comments about the child's body, make sexualized comments, or even attempt to touch the child. She further testified that abusers sometimes will also engage in gift giving as a form of grooming behavior.

During Williams' direct testimony, the following colloquy occurred:

appeal, the defendant asserts, for the first time, that the hypothetical questions posed by the prosecutor were improper because they called for Williams to opine on the behavior of the alleged sexual abuser. We agree with the state that this evidentiary claim was not preserved and is, therefore, not reviewable. Accordingly, we limit our analysis of the hypotheticals to address only whether Williams' response to them constituted improper vouching for the complainants' credibility, and we do not address whether the trial court abused its discretion by allowing Williams to testify regarding the defendant's behavior.

"Q. . . . I'm gonna ask you a couple hypotheticals. Hypothetically, if an abuser was trying to engage a child into complying with sexual abuse, would referring to the sexual abuse of another child, maybe a sibling, in the same manner be a form of grooming?

"A. Yes.

"Q. And how so?

"A. It's normalizing the behavior where—"

Defense counsel then objected, arguing that it was an improper attempt to bolster the testimony of one of the complainants. The trial court excused the jury and then explained that, under *State* v. *Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012), an expert witness can be asked hypothetical questions, as long as the expert is not being asked to comment specifically about the complainant's credibility. The court noted that, during cross-examination, defense counsel will be free to ask Williams whether she had spoken to any of the witnesses in the complainants' cases and whether she had any knowledge of the specifics of the cases. The court also asked Williams whether she had conducted a forensic interview with either complainant, and she answered "[n]o." The court then overruled defense counsel's objection.

Once the jury reentered the courtroom, the prosecutor continued his direct examination of Williams, and the following colloquy occurred:

"Q. So, back to that hypothetical. If an abuser was trying to engage a child with complying with sexual abuse, would referring to the sexual abuse of another child, let's say, for example, a sibling, in the same manner be a form [of] grooming?

"A. It could be.

"Q. Okay. And . . . in your professional experience . . . what is going on with that?

"A. So . . . when other children are referred to typically by . . . an abuser, it's kind of telling that child that

. . . it's okay, other kids do this too. So, it's kind of just a form of sort of putting information in a child's head so that they're thinking . . . that it's okay, even though it's very confusing for a child.

"Q. Okay. Thank you. Other hypothetical: if an abused child did not live with their abuser, would giving gifts to the child but conditioning them that they only be played with at the abuser's home be an example of grooming?

"A. It could be.

"Q. Okay. Can you elaborate?

"A. So, gift giving can often be part of . . . the grooming process, but also along the lines with the grooming process can be some forms of control and sort of wanting to be in charge, and that would be sort of an example of . . . when you come here, these items are to stay here, so what goes on at that time stays there, and then other things go on at other times in a different place.

"Q. And I'm sure [defense counsel] is gonna ask you . . . could there be innocent explanations for gift giving as well?

"A. Sure."

On cross-examination, defense counsel elicited testimony from Williams that she did not view any forensic interview of C or P, had never met C or P, and was unable to tell the jury anything about C or P, including whether they had been the victims of sexual abuse.

In its instructions to the jury, the trial court identified Williams as an expert witness and provided the jury with the following charge: "An expert witness may state an opinion in response to a hypothetical question, and some experts have done so in this case. A hypothetical question is one in which the witness is asked to assume that certain facts are true and to give an opinion based on those assumptions. The value of the opinion given by an expert in response to a hypothetical question depends upon the relevance, validity and completeness of the

facts he or she was asked to assume. The weight that you will give to the opinion of an expert will depend on whether you find that the facts assumed were proved and whether the facts relied on in reaching the opinion were complete or whether material facts were admitted or not considered. Like all other evidence, an expert's answer to a hypothetical question may be accepted or rejected, in whole or in part, according to your best judgment.

"Allowing someone to give . . . expert testimony is in no way an endorsement by the court of the testimony or the credentials of the [witness]. Such testimony is presented to you to assist you in your deliberations. No such testimony is binding upon you, and you may disregard the testimony either in whole or in part. It is for you to consider the testimony with the other circumstances in the case and, using your best judgment, determine whether you will give any weight to it and, if so, what weight you will give to it." The trial court further instructed the jury that it was to consider Williams' "general credibility in accordance with the instructions on credibility applicable to all witnesses."

We begin with the standard of review and the governing legal principles. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Taylor G.*, 315 Conn. 734, 760, 110 A.3d 338 (2015).

"[I]n cases that involve allegations of sexual abuse of children, we have held that expert testimony of reactions

and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful. . . . In this regard, we have found expert testimony stating that a victim's behavior was generally consistent with that of a victim of sexual or physical abuse to be admissible, and have distinguished such statements from expert testimony providing an opinion as to whether a particular victim had in fact suffered sexual abuse." (Internal quotation marks omitted.) Id., 761.

In the present case, the defendant asserts that Williams' testimony in response to hypothetical questions constituted impermissible vouching for the credibility of the complainants, like the testimony we deemed inadmissible in *State* v. *Favoccia*, supra, 306 Conn. 780. We disagree.

In *Favoccia*, this court addressed whether an expert witness' response to four questions posed by the prosecutor amounted to impermissible vouching for the credibility of the complainant or an opinion on the ultimate issue of whether the complainant had been sexually assaulted. See id., 772, 781. In that case, the questions related to whether the complainant had exhibited behaviors characteristic of child sexual assault victims. See id., 772, 782–85. The court concluded that the testimony of the expert witness was improper because, rather than limit her testimony to general behavioral characteristics, the expert offered her opinion that the specific complainant had in fact exhibited the specified behaviors. See id., 780, 805–807.

This court explained that "our concerns about indirect vouching . . . require us to limit expert testimony about the behavioral characteristics of child sexual assault victims . . . to that which is stated in general or hypothetical

terms, and to preclude opinion testimony about whether the specific complainant has exhibited such behaviors. . . . [T]here is no material distinction between express testimony that the child has been sexually abused, and implicit testimony that outlines the unreliable behavioral reactions found with sexually abused victims, followed by a list of the complainant's own behavioral reactions, that points out that the two are consistent, and then invites the jury to add up the points to conclude that the child has been sexually abused." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 803–804.

"Generalized testimony is sufficient to provide the jury with the valuable knowledge, which it is unlikely to have otherwise . . . . Thus, we agree with those authorities observing that more specific testimony yields returns that increase in prejudice to the defendant as they diminish in value with respect to the edification of the jury as to behaviors that might affect the complainant's credibility. . . . Accordingly, we . . . conclude that, although an expert witness may testify generally about the behavioral characteristics of child sexual assault victims, an expert witness may not opine about whether the specific complainant has exhibited such behaviors." (Citations omitted; footnotes omitted.) Id., 804–805.

Williams' testimony is distinguishable from the testimony deemed inadmissible in *Favoccia* and its progeny. Unlike the expert witness in *Favoccia*, Williams was not asked to testify about the behaviors of the complainants. Williams testified that she had not met the complainants, that she had not viewed any forensic interviews, and that she was not able to tell the jury anything about the complainants. Instead, Williams' testimony was limited to describing general behavioral characteristics that are consistent with those exhibited by children who are the victims of sexual abuse. The challenged hypothetical questions asked Williams to opine as to whether the hypothetical facts were consistent with behavior known as "grooming."

Accordingly, we conclude that the prosecutor's questions and Williams' answers to those questions fell within the scope of expert testimony recognized as permissible in *State* v. *Favoccia*, supra, 306 Conn. 780, 805. We appreciate that tailored hypotheticals that outline the general behavioral reactions often exhibited by children who have experienced sexual abuse, followed by a list of the complainants' own behavioral reactions, raise the risk that the expert witness' testimony in response to the hypothetical questions may invite the jury to infer that the expert endorses the truthfulness of the complainants' allegations of sexual abuse. See id., 803–804. Nevertheless, the fact that the hypothetical questions posed by the prosecutor implicate the factual scenarios involved in the present cases did not, by itself, make Williams' testimony inadmissible. Indeed, the fact that the hypothetical questions presumed facts similar to those in the present cases is what made Williams' testimony in response to those hypotheticals relevant. See Conn. Code Evid. § 7-4 (c). Here, our examination of the record convinces us that Williams' testimony was admissible, in that Williams did not outline general behaviors, followed by a list of the complainants' reactions, or opine on whether either of the complainants had exhibited any specific behaviors. See, e.g., *State* v. *Taylor G.*, supra, 315 Conn. 765 (concluding that expert testimony was relevant and admissible when, "unlike the expert in *Favoccia*, [the expert] never drew a comparison between [the complainant] and the characteristics [the expert] described as typical of child sexual abuse victims generally"). Instead, Williams testified only generally about the characteristics of grooming.

In sum, the hypothetical questions were within the bounds outlined by the Connecticut Code of Evidence and did not cross the line established by *Favoccia*. Accordingly, we conclude that the trial court did not abuse its discretion in overruling defense counsel's objection to the challenged hypotheticals.

The judgments are affirmed.

In this opinion the other justices concurred.